**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| CHARRAN M. HAYES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:10CV423 |
| | ) | 1:10CV425 |
| GGP-FOUR SEASONS, L.L.C., GENERAL | ) | |
| GROWTH PROPERTIES, INC., MYDATT | ) | |
| SERVICES, INC. d/b/a VALOR | ) | |
| SECURITY SERVICES, and THE GAP, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on summary judgment motions filed by Defendants (1:10CV423, Docket Entries 53, 55, 57), as well as Plaintiff's related "Motion for Redress due to Spoliation [sic]" (1:10CV425, Docket Entry 24).[1]  For the reasons that follow, it is recommended that the Court enter summary judgment for Defendants because, even granting Plaintiff any adverse inference reasonably warranted by the alleged spoliation, the record warrants judgment as a matter of law for Defendants on Plaintiff's negligence claims.

---

[1] Although only one "case or controversy" exists between these parties, the Clerk assigned two case numbers to this action because of the particular manner of its removal from state court to this Court, a circumstance the Court promptly addressed through consolidation.  (See 1:10CV423, Docket Entry 13 at 1 (consolidating 1:10CV423 and 1:10CV425).)  Parenthetical citations herein thus generally will refer only to the docket in the lead case, 1:10CV423; however, because Plaintiff has continued to make certain filings only in 1:10CV425, some parenthetical citations will refer to that case number as well.

## BACKGROUND

Plaintiff instituted this action in state court (see 1:10CV423, Docket Entries 4, 6, 7) and Defendants removed it to this Court based on diversity jurisdiction (see 1:10CV423, Docket Entries 1, 2, 3). Plaintiff's pleadings assert claims of negligence against Defendants (see 1:10CV423, Docket Entry 6, ¶¶ 7, 30, 31, 32, 33, 34; 1:10CV423, Docket Entry 7, ¶¶ 2, 3, 5) based, in relevant part, on the following factual allegations:

1) "[o]n or about December 23, 2006, Plaintiff was patronizing at Four Seasons Town Centre [('FSTC'), a shopping mall in Greensboro, North Carolina, owned and operated by Defendant GGP-Four Seasons, L.L.P. and Defendant General Growth Properties, Inc. (collectively, the 'GGP Defendants')], when, as he was inside [Defendant The Gap, Inc.'s] store, he was shot four times [by Vernon Platt]" (1:10CV423, Docket Entry 6, ¶ 23);

2) "prior to December 23, 2006, numerous violent crimes occurred on [FSTC's] premises" (id., ¶ 25);

3) "[a]pproximately one month prior to December 23, 2006, there was a fatal, unrelated, shooting in the parking lot of [FSTC's] premises" (id., ¶ 27); and

4) Defendant Mydatt Services, Inc. ("Defendant Mydatt") (the "entity providing security at [FSTC] . . . [pursuant to] a valid contract [with Defendant GGP-Four Seasons, L.L.P.]" (1:10CV423, Docket Entry 7, ¶¶ 3-4)) and Defendant The Gap, Inc. ("Defendant Gap") "were aware of the violence that had frequently occurred on the premises of [FSTC]" (1:10CV423, Docket Entry 6, ¶ 28).

Following removal, Plaintiff filed his instant "Motion for Redress due to Spoiliation [sic]" ("Spoliation Motion"), asserting in relevant part as follows:

1) "[o]n or about December 23, 2006, [FSTC] had 59 digital recording cameras to monitor its premises 24 hours a day" (1:10CV425, Docket Entry 24, ¶ 6);

2) "[a]ccording to Vernon Platt's sworn testimony [at his state criminal trial for shooting Plaintiff], [Platt] was at [FSTC] for five hours prior to shooting the Plaintiff" (id., ¶ 8);

3) "[o]n the day and at the time and place in question, Vernon Platt was wearing an obscene and violent shirt" (id., ¶ 10);

4) "[t]here is evidence . . . that [Vernon Platt's] actions during the five hour period were erratic and inappropriate . . . [and] that [he] was carrying a .357 glock gun at all times while he was at [FSTC]" (id., ¶¶ 13, 14); and

5) "all video up to the actual shooting was destroyed after six months" (id., ¶ 11).

Based on the foregoing factual allegations, Plaintiff's Spoliation Motion "prays that the Court draw an adverse inference against the Defendants under the Spoliation of Evidence Doctrine and for such relief that the Court deems just and proper." (Id. at 2.) Defendants have responded in opposition to the Spoliation Motion (see 1:10CV425, Docket Entries 31, 32, 33) and Plaintiff has replied (see 1:10CV425, Docket Entry 34). Defendants then filed their instant summary judgment motions. (See 1:10CV423, Docket Entries 53, 55, 57; see also 1:10CV425, Docket Entries 39, 41.)

-3-

According to the GGP Defendants, "[s]ummary [j]udgment is warranted because there is no genuine issue of material fact as to the lack of foreseeability of the incident which gave rise to this litigation." (1:10CV423, Docket Entry 53 at 1.) The GGP Defendants further have asserted that Platt was not amenable to deterrence by reasonable security measures and that they provided appropriate security. (See 1:10CV423, Docket Entry 54 at 11-13.)

"Defendant Gap [has] move[d] for summary judgment on the grounds that (1) there is no genuine issue of material fact as to the essential element of the foreseeability of the shooting incident involving the Plaintiff in Defendant Gap's store, and (2) the Plaintiff was contributorily negligent as a matter of law." (1:10CV423, Docket Entry 57 at 1.) In addition, Defendant Gap's summary judgment brief argues that Plaintiff's shooting "was not preventable by any reasonable measures" and that both "the level of security provided by [the GGP Defendants] . . . and the reliance by Defendant Gap on [that] security was entirely appropriate." (1:10CV423, Docket Entry 58 at 11.)

Finally, Defendant Mydatt has sought summary judgment on the ground that "there is no genuine issue as to any material facts shown by the pleadings and depositions establishing that [it] was negligent in providing its security services at the [FSTC] on the day in which the Plaintiff was shot . . . ." (1:10CV423, Docket Entry 55 at 1.) More specifically, Defendant Mydatt's summary judgment brief contends that, in addition to the lack of foreseeability of Plaintiff's shooting, its duty extends only to

-4-

the terms of its contract with the GGP Defendants and no breach of that duty occurred. (See 1:10CV423, Docket Entry 56 at 4-15.)

Plaintiff has responded in opposition to Defendants' foregoing summary judgment motions. (See 1:10CV425, Docket Entries 43, 44, 45; see also 1:10CV423, Docket Entries 59, 60, 61.)[2] The GGP Defendants and Defendant Gap have replied (see 1:10CV423, Docket Entries 62, 63) and the time for Defendant Mydatt to reply (i.e., 17 days from October 21, 2011, the date of Plaintiff's electronic service of his response to Defendant Mydatt's summary judgment motion (1:10CV425, Docket Entry 44), see M.D.N.C. R. 7.3(h) ("A reply brief may be filed within 14 days after service of the response."); see also Fed. R. Civ. P. 6(d) (adding three days to local rule time-limits where service occurred via agreed electronic means)), has passed without Defendant Mydatt filing a reply (see 1:10CV425, Docket Entries dated Oct. 21, 2011, to present; see also 1:10CV423, Docket Entries dated Oct. 21, 2011, to present).

---

[2] Plaintiff initially filed his summary judgment responses only in 1:10CV425, despite the fact that the GGP Defendants and Defendant Mydatt filed their summary judgment motions in both 1:10CV423 and 1:10CV425 and that Defendant Gap filed its summary judgment motion only in 1:10CV423 (as was appropriate in light of the prior consolidation). The Clerk's Office did not publicly docket Plaintiff's response to Defendant Gap's summary judgment motion (because of the absence of any corresponding motion docketed under that case number); instead, the Clerk's Office directed Plaintiff to file his summary judgment responses in 1:10CV423. (See 1:10CV425, Docket Entry 45.) Plaintiff then did file his summary judgment responses in 1:10CV423, but (in so doing) failed to alter the case number in the captions. (See 1:10CV423, Docket Entries 59, 60, 61.) The Clerk's Office directed Plaintiff to correct this deficiency (see 1:10CV423, Docket Entry dated Oct. 28, 2011), but he has not complied (see 1:10CV423, Docket Entries dated Oct. 28, 2011, to present). In the interests of justice, the undersigned Magistrate Judge will consider Plaintiff's summary judgment responses despite this non-compliance and, therefore, will direct the Clerk to make all of Plaintiff's improperly-filed summary judgment responses publicly available.

<u>DISCUSSION</u>

<u>Underlying Legal Standards</u>

"A federal court, sitting in North Carolina in a diversity case, must apply the law as announced by the highest court of that state or, if the law is unclear, as it appears the highest court of that state would rule." <u>Brendle v. General Tire & Rubber Co.</u>, 505 F.2d 243, 245 (4th Cir. 1974). In making that assessment:

> <u>[A] federal court must look first and foremost to the law of the state's highest court</u>, giving appropriate effect to all its implications. A state's highest court need not have previously decided a case with identical facts for state law to be clear. It is enough that a fair reading of a decision by a state's highest court directs one to a particular conclusion. Only when this inquiry proves unenlightening . . . should a federal court seek guidance from an intermediate state court.

> When seeking such guidance [federal courts] defer to a decision of the state's intermediate appellate court to a lesser degree than [they] do to a decision of the state's highest court. Nevertheless, [federal courts] do defer. Indeed, the Supreme Court has specifically directed:

>> <u>[w]here an intermediate appellate state court rests its considered judgment</u> upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

> Thus, a federal court must "present" persuasive data when it chooses to ignore a decision of a state intermediate appellate court that is <u>directly on point</u>. What a federal court, sitting in diversity, cannot do is simply substitute its judgment for that of the state [intermediate appellate] court.

> . . . .

> Generally, only if the <u>decision</u> of a state's intermediate court cannot be reconciled with state statutes, or

decisions of the state's highest court, or both, may a
federal court sitting in diversity refuse to follow it.
When an intermediate state court <u>decision</u> is at odds with
an existing statutory scheme or one amended after
issuance of the intermediate court's <u>decision</u>, a federal
court may justifiably surmise that the statute presents
persuasive data that the state's highest court would not
follow the intermediate court's <u>decision</u>. Similarly, the
holdings of a state's highest court that undermine the
rationale of an intermediate appellate court decision may
constitute such persuasive data; this is so even if a
state supreme court holding antedates the inferior
court's opinion. However, a federal court must closely
scrutinize the assertedly conflicting statutory schemes
or supreme court decisions to satisfy itself that they
truly do undermine an intermediate appellate court
decision directly on point.

A federal court can depart from an intermediate [state
appellate] court's <u>fully reasoned holding</u> as to state law
only if "convinced" that the state's highest court would
not follow that holding. Accordingly, a federal court
cannot refuse to follow an intermediate appellate court's
<u>decision</u> simply because it believes the intermediate
court's <u>decision</u> was wrong, bad policy, or contrary to
the majority rule in other jurisdictions.

<u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1002-03 (4th

Cir. 1998) (quoting <u>West v. American Tel. & Tel. Co.</u>, 311 U.S. 223,

237 (1940)) (internal citations omitted) (emphasis added).

Although "the substantive elements of [Plaintiff's claims] are

all questions to be determined by state law in [this] diversity

action . . . , whether there is sufficient evidence to create a jury

issue of those essential substantive elements of the action, as

defined by state law, is controlled by federal rules." <u>Fitzgerald</u>

<u>v. Manning</u>, 679 F.2d 341, 346 (4th Cir. 1982). Under those federal

rules, "[t]he [C]ourt shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In making this determination, the Court "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). Instead, it "must consider the evidence in the light most favorable to the non-moving party and draw all <u>reasonable</u> inferences from the facts in the non-movant's favor." <u>Matvia v. Bald Head Island Mgt., Inc.</u>, 259 F.3d 261, 266 (4th Cir. 2001) (emphasis added).

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'" <u>Carr v. Deeds</u>, 453 F.3d 593, 608 (4th Cir. 2006) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" <u>Emmett v. Johnson</u>, 532 F.3d 291, 297 (4th Cir. 2008) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)); <u>see also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

## Sufficiency of the Evidence of Negligence

As set forth above, see supra, p. 2, Plaintiff has asserted claims of negligence against: 1) an entity that owned and operated the store in which non-party Platt shot Plaintiff (Defendant Gap); 2) two entities that owned and operated the shopping mall that housed that store (the GGP Defendants); and 3) an entity that contracted to provide security services at that mall (Defendant Mydatt).  To make out a negligence claim under North Carolina law, Plaintiff must show:  "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach."  Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). Defendants' summary judgment motions and briefs (summarized above, supra, pp. 4-5) contain arguments contesting the sufficiency of Plaintiff's evidence on the duty and breach elements of his claims.

*Proof of a Duty Owed by the GGP Defendants and Defendant Gap*

In connection with the first element of a negligence claim, "[n]o legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care."  Stein, 360 N.C. at 328, 626 S.E.2d at 267 (emphasis added).[3]  "Unlike many cases involving common law negligence claims, here [Plaintiff] desire[s] damages from [Defendants] for the actions of third persons.  There is no allegation [Defendants] or [their] personnel encouraged, planned, or executed the shooting; rather, [Plaintiff] rest[s] [his] claim[s] on the failure of [Defendants], to take reasonable

---

[3] "Foreseeability is also an element of proximate cause." Stein, 360 N.C. at 328 n.5, 626 S.E.2d at 268 n.5.

-9-

steps to frustrate the [shooting]." <u>Id.</u> at 328, 626 S.E.2d at 268.
The North Carolina Supreme Court "ha[s] often remarked the law's
reluctance to burden individuals or organizations with a duty to
prevent the criminal acts of others." <u>Id.</u> "[The North Carolina
Supreme Court's] cases typically regard such acts as unforeseeable
and 'independent, intervening causes absolving the defendant of
liability.'" <u>Id.</u> at 329, 626 S.E.2d at 268 (quoting <u>Foster v.
Winston-Salem Joint Venture</u>, 303 N.C. 636, 638, 281 S.E.2d 36, 38
(1981)) (internal brackets omitted).

More specifically, the North Carolina Supreme Court has held
that a business owner owes "an individual who enters the premises
of [the business] as a customer during business hours . . . [t]he
general duty . . . <u>not</u> to insure the safety of [such] customers,
but to exercise ordinary care to maintain [the] premises in such a
condition that they may be used safely by [customers] in the manner
for which they were designed and intended." <u>Foster</u>, 303 N.C. at
638, 281 S.E.2d at 38 (emphasis added). Accordingly, under North
Carolina law, "[o]rdinarily [a business] owner is not liable for
injuries to [customers] which result from the intentional, criminal
acts of third persons." <u>Id.</u> "Nevertheless, the [North Carolina
Supreme Court has] recognized . . . that where circumstances
existed which gave the owner reason to know that there was a
likelihood of conduct on the part of third persons which endangered
the safety of his [customers], a duty to protect or warn [them]
could be imposed." <u>Id.</u> at 638-39, 281 S.E.2d at 38; <u>see also</u> <u>id.</u>
at 640, 281 S.E.2d at 39 (quoting with approval statement in

-10-

Restatement (Second) of Torts, Section 344, Comment f that, "[i]f the place or character of [a] business, or [the owner's] past experience, is such that [the owner] should reasonably anticipate . . . criminal conduct on the part of the third persons, either generally or at some particular time, [the owner] may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection").

Foreseeability Based on Prior Criminal Activity

Under North Carolina law, "[t]he most probative evidence on the question of whether a criminal act was foreseeable is evidence of similar prior criminal activity committed on the defendant's premises." Purvis v. Bryson's Jewelers, Inc., 115 N.C. App. 146, 147, 443 S.E.2d 768, 769 (1994) (affirming entry of summary judgment for defendant-business by Beaty, J.); accord Dettlaff v. Holiday Inns, Inc., 10 Fed. Appx. 100, 102 (4th Cir. 2001) (citing Connelly v. Family Inns of Am., Inc., 141 N.C. App. 583, 588, 540 S.E.2d 38, 41 (2000)).  Additionally, "evidence of criminal acts occurring near the premises in question may be relevant to the question of foreseeability . . . ." Murrow v. Daniels, 321 N.C. 494, 501, 364 S.E.2d 392, 397 (1988).  Consistent with that authority, Plaintiff has argued that "the shooting was foreseeable by [the GGP Defendants and Defendant Gap because of] . . . the past criminal activities that occurred at [FSTC]." (1:10CV423, Docket Entry 59 at 4; 1:10CV423, Docket Entry 60 at 4.)

As evidence of such relevant "past criminal activities," id., Plaintiff's summary judgment response identifies the following:

-11-

The [P]roperty [P]rofile, which was completed [by Defendant Mydatt] two months after the incident in question . . . states that the busiest day at [FSTC] is Saturday. It also states that in between 2004 and 2006 there were <u>nine robberies</u>, <u>one homicide</u>, 11 burglaries, <u>nine assaults</u>, 71 instances of disorderly conduct and 336 larcenies on [FSTC] property. Additionally, the profile states that the day of the week that crime occurred the most in 2006 [sic] on Saturday and this crime mostly occurred in retail spaces. Plaintiff was shot on a Saturday in 2006. One month prior to this there was a murder in the parking lot of [FSTC].

(1:10CV423, Docket Entry 59 at 5 (emphasis added) (citing Docket Entry 60-2 at 3-5); 1:10CV423, Docket Entry 60 at 4-5 (emphasis added) (citing Docket Entry 60-2 at 3-5).)[4] The Property Profile cited by Plaintiff also lists one "aggravated assault" separate from the nine "assaults" referenced in Plaintiff's above-quoted summary judgment brief. (<u>See</u> 1:10CV423, Docket Entry 60-2 at 4-5.)

The evidence of past criminal activity on which Plaintiff relies to establish the foreseeability of his shooting thus consists of 20 total crimes which by definition involve the use (or threatened use) of force against a person (i.e., nine robberies, nine assaults, one aggravated assault, and one homicide) in three years.[5] In other words, the statistics Plaintiff has cited reflect

_____

[4] In the quotation above, Plaintiff used the phrase "between 2004 and 2006" to describe the period in which the enumerated crimes occurred. (1:10CV423, Docket Entry 59 at 5; 1:10CV423, Docket Entry 60 at 4-5.) Moreover, one of Plaintiff's summary judgment briefs refers to the time-frame encompassed by the cited crime totals as "the two years preceding [his] shooting" (1:10CV423, Docket Entry 59 at 5). In fact, however, the crime figures in question represent the sum of the entries in separate columns with headings "2004," "2005," and "2006." (1:10CV423, Docket Entry 60-2 at 4-5.) The totals for each type of crime cited by Plaintiff thus occurred over a three-year time span. (<u>See</u> <u>id.</u>)

[5] "[C]ertain considerations restrict [courts] as to which evidence of prior criminal activity is properly considered." <u>Connelly</u>, 141 N.C. App. at 588, 540
(continued...)

-12-

that, before his shooting, crimes involving use (or threatened use) of force against persons (like his shooting) occurred six to seven times a year at FSTC, a shopping mall that (according to the Property Profile relied on by Plaintiff) catered to a population-base of 611,700 people and featured 1,141,000 square feet of interior retail space, as well as nearly 6,000 parking spaces (see 1:10CV423, Docket Entry 60-2 at 1).

Given the scale of FSTC (in terms of both physical area and customer numbers), such relatively infrequent prior instances of relevant criminal conduct cannot reasonably support Plaintiff's assertion that a "high volume of violent crimes . . . occurred on [FSTC] property [sufficient to] put [the GGP Defendants] on ample notice that its invitees were in serious danger of being the victim

---

[5](...continued)
S.E.2d at 41. In this regard, Plaintiff has acknowledged that, "[b]ecause [his shooting was] an attempted murder, one must examine only prior violent crimes to use in the foreseeability test." (1:10CV423, Docket Entry 59 at 5.) However, Plaintiff would include the 11 burglaries documented in the Property Profile in the universe of past "violent crimes" relevant to the foreseeability inquiry. (See id.) Although burglaries of businesses are dangerous offenses because of the resulting risk of confrontation between burglar and business owner/employee/ security guard, see, e.g., United States v. Brown, 514 F.3d 256, 265-69 (2d Cir. 2008) (joining courts that "have concluded that burglary of a commercial building involves conduct that presents a serious potential risk of physical injury to another"), such crimes generally do not involve the application (or intentional threat) of force against persons. Further, Plaintiff's shooting did not arise from or otherwise involve any form of breaking and entering, unlike other assaultive-type incidents as to which North Carolina courts found past breaking and entering crimes relevant for determining foreseeability, see Murrow, 321 N.C. at 495-96, 501-02, 364 S.E.2d at 394, 397-98 (treating prior breaking and enterings as relevant to foreseeability finding for claim arising from motel guest's assault and robbery by criminals who forced entry into motel room); Connelly, 141 N.C. App. at 585, 589, 540 S.E.2d at 40, 42 (same). In sum, under the circumstances of this case, prior burglaries at FSTC lack sufficient similarity to Plaintiff's shooting to factor into the foreseeability analysis. See generally Purvis, 115 N.C. App. at 147-48, 443 S.E.2d at 769-70 (ruling prior incident where "person broke in after hours and stole a small amount of merchandise" too dissimilar to "armed robbery" to show foreseeability).

-13-

of a crime by a third party (1:10CV423, Docket Entry 60 at 5 (emphasis added)) and/or that "sufficient criminal activity [occurred] to put [Defendant] Gap on notice that its store was located in a dangerous mall" (1:10CV423, Docket Entry 59 at 5 (emphasis added)).  By way of contrast, the two cases in which the North Carolina Supreme Court has found sufficient evidence to raise a fact-question as to the foreseeability to a business owner of third-party crime involved:  1) 100 criminal incidents deemed relevant at a commercial intersection in a four-and-a-half-year period before the crime at issue (i.e., approximately 20 per year), Murrow, 321 N.C. at 502, 364 S.E.2d at 397-98; and 2) 31 criminal incidents deemed relevant at a shopping mall in the year preceding the crime in question, Foster, 303 N.C. at 642, 281 S.E.2d at 40.[6]

---

[6] Opinions in which, as a necessary part of its holding, the North Carolina Court of Appeals has found sufficient evidence for a plaintiff pursuing a claim of this sort to survive summary judgment on the foreseeability issue also have involved substantially more (and more frequent) relevant prior crimes than the instant record reflects.  See Connelly, 141 N.C. App. at 589, 540 S.E.2d at 42 ("The evidence in this case, when viewed in the light most favorable to the plaintiffs, indicates that in the five years preceding the armed robbery in this case, one hundred instances of criminal activity bearing on the issue of foreseeability occurred at the I-95, U.S. 301 intersection." (emphasis added)); Urbano v. Days Inn of Am., Inc., 58 N.C. App. 795, 798, 295 S.E.2d 240, 242 (1982) ("The materials before the trial court in this case tended to show that [the defendant] knew of at least 42 episodes of criminal activity taking place on its motel premises during a period of three years preceding the date of plaintiff's injury." (emphasis added)).  One opinion of the North Carolina Court of Appeals endorses the view that fewer (and less frequent) instances of relevant prior crimes than this record documents could support a finding of foreseeability:  Liller v. Quick Stop Food Mart, Inc., 131 N.C. App. 619, 623, 507 S.E.2d 602, 605 (1998) ("In light of six undisputed violent incidents over a three-year period, we cannot say as a matter of law that the evidence was insufficient to charge defendant with knowledge that injuries such as that incurred by plaintiff were likely . . . ." (internal brackets citations, ellipses, and quotation marks omitted) (emphasis added)).  This Court, however, should not deny Defendants summary judgment on the foreseeability issue based on
(continued...)

-14-

To permit a finding that the GGP Defendants and Defendant Gap had a duty to prevent third-party violence based on the substantially fewer (and less frequent) past relevant crimes in this record would work an injustice contrary to North Carolina law. As the North Carolina Court of Appeals observed over a quarter century ago, it is unlikely "there exists a community in this State which is entirely crime-free.  In the broadest sense, all crimes anywhere are 'foreseeable.' . . .  [However,] to impose a duty [on a business to prevent crime] absent true foreseeability of criminal activity . . . would be grossly unfair." Sawyer v. Carter, 71 N.C. App. 556, 562, 322 S.E.2d 813, 817 (1984).[7]

---

[6](...continued)
Liller for two reasons.  First, the six relevant crimes over three years at issue in Liller occurred at a single convenience store, whereas the 20 relevant crimes over three years at issue in this case took place across FSTC's vastly larger and more frequented premises.  This marked difference in the relative volume of relevant prior criminal activity renders Liller inapposite.  See Assicurazioni Generali, 160 F.3d at 1002 (stating that federal courts must follow intermediate state appellate court decisions "directly on point").  Second, in Liller, the North Carolina Court of Appeals affirmed the trial court's entry of summary judgment against the plaintiff based on the insufficiency of the evidence on the proximate cause element of the negligence claim, see Liller, 131 N.C. App. 619, 624-26, 507 S.E.2d 602, 606-07; the discussion in Liller about the sufficiency of the evidence as to the duty element of said claim (including the foreseeability component thereof) thus constitutes mere dicta, not the basis for the "judgment," "holding," or "decision" to which this Court must defer under Assicurazioni Generali, 160 F.3d at 1002-03.  See Board of Comm'rs of Hertford Cnty., N.C. v. Tome, 153 F. 81, 87 (4th Cir. 1907) ("[E]xpressions found in opinions of courts which relate to a doctrine of law not necessarily in issue in the case then before the court are not to be regarded as deliberate and binding enunciations of such doctrines.  Carroll v. Carroll's Lessee, 16 How. 275, 287, 14 L.Ed. 936.  It is probable that there is no volume of the Supreme Court Reports in which the idea is not advanced that expressions of opinion not necessary to the determination of the case are to be regarded as dicta.").

[7] This conclusion applies with particular force as to Defendant Gap, given the absence of any evidence that the prior relevant crimes at FSTC happened at Defendant Gap's store.  See Purvis, 115 N.C. App. at 146-48, 443 S.E.2d at 769-70 ("[W]hile evidence of crimes away from the premises may be relevant, courts are
(continued...)

-15-

Foreseeability Based on Observation of Platt

In addition to Plaintiff's foregoing contentions that prior crimes of violence at FSTC made his shooting foreseeable to the GGP Defendants and Defendant Gap, Plaintiff has argued that "Platt's conduct forecasted danger to [the GGP Defendants and Defendant Gap]." (1:10CV423, Docket Entry 59 at 5; 1:10CV423, Docket Entry 60 at 5.) In this regard, Plaintiff's summary judgment responses assert that Platt "was loitering around the mall for five hours, which is against [the GGP Defendants'] code of conduct, not shopping, wearing a violent t-shirt, and carrying a loaded weapon, which is also against [the GGP Defendants'] code of conduct." (1:10CV423, Docket Entry 59 at 5; 1:10CV423, Docket Entry 60 at 5-6.) Additionally, Plaintiff has stated that Platt "was bipolar, off of his medication, and 'tripping.'" (1:10CV423, Docket Entry 59 at 5; accord 1:10CV423, Docket Entry 60 at 2, 6.)

As support for these factual assertions, Plaintiff has pointed to Platt's testimony at his state criminal trial for the shooting (on March 19, 2008) and a photocopy of a portion of the t-shirt Platt allegedly wore at the time of the shooting. (See 1:10CV423, Docket Entry 59 at 2, 5; 1:10CV423, Docket Entry 60 at 2, 5-6; see also 1:10CV423, Docket Entry 59-1 (copy of portion of Platt's alleged t-shirt); 1:10CV425, Docket Entry 25 at 83-127 (copy of transcript of Platt's state criminal trial testimony).) In addition, Plaintiff has alleged (consistent with his Spoliation

---

[7](...continued)
reluctant to impose liability absent evidence of prior criminal activity on the premises.").

Motion, see supra, p. 3) that "[t]he best evidence of [Platt's] behavior [at FSTC] is the video footage of him wandering around the mall for five hours. However, [the GGP Defendants] ha[ve] destroyed this footage." (1:10CV423, Docket Entry 60 at 6.) The discussion that follows therefore will address Platt's testimony at his state criminal trial, Platt's alleged t-shirt, and the possible impact of any adverse inference for spoliation.

Regarding the first of these matters, the record reflects that, at his state criminal trial, Platt testified, in relevant part, as follows:

1) on December 23, 2006, Platt went to FSTC "around 4:30, five o'clock" in the afternoon, with a friend and "a new acquaintance" (1:10CV425, Docket Entry 25 at 84-85);

2) Platt stayed with the other two individuals "for probably about like 15, 20 minutes then [they] parted ways" for the rest of the evening (id. at 85-86);

3) during the time Platt was with the other two individuals, "[t]hey said [he] was tripping at some point" (id. at 111);

4) Platt was carrying a .357 handgun in his "left front pocket" during "the whole time" he was at FSTC, because he felt "paranoid" and thought people were "out to get [him]" due to the fact that he "hadn't been taking [his] medication [for] . . . bipolar [condition]" (id. at 86-87, 93, 112);

5) while at FSTC, Platt "was kind of window shopping for stuff to buy for [his] sister" (id. at 87-88; accord id. at 112);

6) around 9:45 p.m., near Defendant Gap's store, Platt passed by Plaintiff, Platt thought that he "kn[e]w [Plaintiff] from somewhere," and Platt "kind of waited around, kind of stared [as Plaintiff] went into [Defendant Gap's] store" (<u>id.</u> at 88, 111);

7) Platt then "went into [Defendant Gap's] store and sat on the bench . . . at the front of the store" (<u>id.</u> at 89);

8) after Platt "sat there for a minute," he approached Plaintiff and asked "was he shopping for somebody" (<u>id.</u>; <u>see also</u> <u>id.</u> at 116 (answering "[m]aybe like five minutes" to question of "[h]ow long [he] s[a]t on that bench and watch[ed] [Plaintiff]");

9) by then, Platt had recognized Plaintiff as an individual who, through a friend, Platt had "linked up with" to arrange for the purchase of some marijuana "probably like two weeks before Thanksgiving" (<u>id.</u> at 91-92; <u>accord</u> <u>id.</u> at 113-14);

10) that purchase never occurred because, when Platt arrived at the time and place arranged, "somebody else showed up instead of [Plaintiff] and basically [Platt] was robbed" (<u>id.</u> at 91);

11) after Platt recognized Plaintiff at Defendant Gap's store, "a fight broke out [when Plaintiff] . . . spit on the ground . . . [and] Platt said, [']Every dog has his day[']" (<u>id.</u> at 90; <u>see also</u> <u>id.</u> at 115 ("I wanted to at least have male ego to say something to the dude, because I know he had something to do with me being robbed."));

12) Plaintiff "swung on [Platt who] kind of . . . brushed [Plaintiff] off and then a struggle began . . . [during which

Plaintiff] lunged for [the] pocket . . . [in which Platt's] loaded .357 [handgun was located]" (id. at 92-93; accord id. at 118);

13) Plaintiff's "hand was small enough to get in [Platt's] pocket and [Plaintiff] grabbed ahold and basically the firearm discharged" (id. at 93-94; accord id. at 118-19);

14) Platt then "kind of blanked out, kind of closed [his] eyes and started shooting with [his] left hand," although he is "right-handed" (id. at 93-94; accord id. at 119);

15) at that point, Platt "looked up and [Plaintiff] was on the ground . . . [and] looked like he was dead" (id. at 94);

16) Platt "tried to walk . . . [and] kind of fell . . . [at] the threshold of the door [to Defendant Gap's store]," where law enforcement officers found him with a gun-shot wound "three inches from [his] . . . upper left hip" and had him transported to the hospital (id. at 94-95, 122); and

17) while at the hospital, Platt talked to a law enforcement officer, but "didn't tell her anything about like what [he told] th[e] jury" and admittedly told "her things that were not true" (id. at 122-24; see also id. at 125 (agreeing that, during interview with officer at the hospital, Platt said "that [he] thought that somebody at the mall was trying to kill [him] and [he] tried to get away" and "that [he had] been tripping").[8]

---

[8] According to an employee of Defendant Gap, the altercation between Platt and Plaintiff occurred as follows:  1) following a brief scuffle, Plaintiff pushed Platt into a merchandise display and ran; 2) Platt pulled out a handgun and fired several shots at Plaintiff; and 3) Platt shot himself as he attempted to run out of the store.  (See 1:10CV423, Docket Entry 56-4 at 33-39, 65-66.)

The second evidentiary consideration cited by Plaintiff on this point, Platt's alleged t-shirt, bears an image of a handgun, two ammunition magazines, and a switch-blade above this text:

> welcome to the hood. there are no gun factories on my block. there are no gun stores in my hood so if my t-shirt shocks you then fix the problem because this is just a t-shirt. imagine this pistol being pointed in your face so somebody can eat tonight. this is my daily reality . . . welcome to the hood.

(1:10CV423, Docket Entry 59-1 (ellipses and lack of capitalization in original.))

As the final element of his instant argument, Plaintiff has taken the position that some adverse inference should arise due to spoliation of evidence related to the failure of Defendants[9] to preserve (until the expiration of the negligence statute of limitations) all footage from all 59 security cameras on FSTC premises for the entire time Platt spent at FSTC. (See 1:10CV425, Docket Entry 27 at 3; see also 1:10CV423, Docket Entry 60 at 6.) "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" Id. (quoting

_____

[9] Plaintiff's Spoliation Motion and related brief refer to "Defendants" collectively (see 1:10CV425, Docket Entry 24 at 2; 1:10CV425, Docket Entry 27 at 2-4), so he appears to seek an adverse inference against all Defendants.

<u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45-46 (1991)).  "[W]hen imposing spoliation sanctions, 'the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct.'"  <u>Id.</u> (quoting <u>Vodusek v. Bayliner Marine Corp.</u>, 71 F.3d 148, 156 (4th Cir. 1995) (noting that such sanctions can include authorizing fact-finder to draw adverse inference)).

For purposes of addressing the summary judgment issues in this case, the undersigned Magistrate Judge will assume that:

1) Defendants had a duty to preserve the security camera footage in question (although Plaintiff's filings do not explain how Defendant Gap or Defendant Mydatt – as opposed to the GGP Defendants – had control over such evidence <u>or</u> how – prior to Platt's testimony on March 19, 2008 – Defendants would have known that Platt spent five hours at FSTC and/or that Platt might have been "tripping" at some point while at FSTC (<u>see</u> 1:10CV423, Docket Entries 59, 60, 61; 1:10CV425, Docket Entries 24, 27, 34)); and

2) in failing to preserve this evidence, Defendants had a sufficiently culpable state of mind to warrant some sanction, up to and including an adverse inference of some sort (although Plaintiff has offered only largely conclusory assertions regarding Defendants' mens rea (<u>see</u> 1:10CV425, Docket Entry 34 at 3)).

The question then becomes, given the foregoing assumptions, what adverse inference properly might arise under the facts of this case and what effect, if any, an appropriate adverse inference might have on the summary judgment determinations.  Neither

Plaintiff's Spoliation Motion and supporting brief (1:10CV425, Docket Entries 24, 27) nor Plaintiff's summary judgment response briefs (1:10CV423, Docket Entries 59, 60, and 61) identify the nature of the adverse inference Plaintiff seeks as a result of the alleged spoliation. Moreover, Plaintiff's summary judgment briefs do not offer any argument about how any adverse inference should impact the summary judgment analysis. (See id.)

Under these circumstances, the undersigned Magistrate Judge concludes the strongest adverse inference that reasonably might apply due to spoliation would be that (if preserved) the security camera footage would have shown Platt wearing the t-shirt described above, supra, p. 20, while "tripping," i.e., acting strangely, and wandering through FSTC without buying anything. Even with such an inference, the record does not support a finding that Platt's behavior at FSTC made Plaintiff's shooting foreseeable.

First, the t-shirt in question does not advocate violence. To the contrary, it conveys a message (albeit provocatively) that society should take steps to curb violence in "the hood" and implicitly blames the existence of such violence on forces outside "the hood." One could not reasonably conclude that a business owner must treat someone wearing a t-shirt of that sort as a threat. Indeed, such a reaction likely would subject a business owner to charges of irrationality or even racism.

Second, no sound basis exists for deducing that conduct reasonably described as "tripping" would cause a business owner to perceive a threat of violence. Anyone who has visited any location

in which large numbers of people from a wide cross-section of society gather (like a shopping mall) has witnessed countless acts of strange behavior. Simply observing such a display does not lead reasonable people to conclude that a serious risk of imminent danger exists. To the contrary, reasonable people continue to frequent public places without constantly scrambling for cover whenever, as regularly occurs, someone acts in an unusual way.

Third, under the circumstances of this case, an inference that Platt's "tripping" conduct at FSTC included any discernible threat of violence would be unreasonable. As Plaintiff has acknowledged, this incident occurred on "a Saturday evening, two days before Christmas and [FSTC] was very crowded." (1:10CV423, Docket Entry 59 at 1; 1:10CV423, Docket Entry 60 at 1.) Plaintiff, however, has failed to identify any evidence that even one of the many customers at FSTC (who would have seen the same things that the missing security footage would have shown) reported seeing Platt engaging in threatening behavior or displaying a weapon.[10]

Fourth, the fact that someone window-shopped at a mall for an extended period of time (even in contravention of the mall's "customer code of conduct") would not cause the mall owner or a business in the mall to form a reasonable belief that the window-shopper presented a danger. Simply put, no connection exists, as a general matter, between excessive window-shopping and violence.

---

[10] Moreover, Platt's state criminal trial testimony (summarized in relevant part above, supra, p. 17) – on which Plaintiff otherwise relies – reflects that, until Platt used it to shoot Plaintiff, Platt kept his handgun in his pocket.

As a final matter, according to Plaintiff, one of Defendant Gap's employees (Alison Hunter) testified that, shortly before the shooting, she "noticed Platt was acting weird and nervous [and that] . . . he was sitting on a bench in [Defendant Gap's] store and not shopping . . . for 10 minutes." (1:10CV423, Docket Entry 59 at 5-6; see also 1:10CV423, Docket Entry 56-4 (copy of transcript of Hunter's deposition).)[11]  In her deposition testimony, Hunter stated that, before the shooting, she saw Plaintiff enter Defendant Gap's store as part of a group and then noticed Platt sitting on a bench near the front of the store. (1:10CV423, Docket Entry 59-4 at 25-27.)  Hunter thought Platt "was waiting on his friends" because "he was tapping his foot." (Id.)  She noticed nothing about Platt sitting on the bench that caused her "any concern." (Id. at 31.)  Hunter testified that Platt "probably" was in Defendant Gap's store for five to 10 minutes before the altercation between he and Plaintiff took place. (Id. at 39.)

---

[11] Plaintiff's response to Defendant Gap's summary judgment motion references purported testimony by Hunter both at Platt's state criminal trial and at a deposition. (See 1:10CV423, Docket Entry 59 at 2, 5-6.)  Plaintiff, however, neither filed a copy of transcripts of any testimony from Hunter with Plaintiff's summary judgment brief nor otherwise identified where, in the record of this case, the Court could find such testimony, as required by the applicable procedural rules, see Fed. R. Civ. P. 56(c)(1)(A); M.D.N.C. R. 56.1(d). (See 1:10CV423, Docket Entry 59.)  As the citation above reflects, the undersigned Magistrate Judge has located in the record of this case a copy of the transcript of Hunter's deposition testimony (among the attachments to Defendant Mydatt's summary judgment brief).  Under these circumstances, the undersigned Magistrate Judge will consider Hunter's deposition, including references therein to her testimony at Platt's state criminal trial.  See Fed. R. Civ. P. 56(c)(3).  Page citations to Hunter's deposition refer to the page numbers in the CM/ECF footer of the docketed copy, not the deposition's internal pagination.

Under examination by Plaintiff's counsel at her deposition, Hunter acknowledged she had testified at Platt's state criminal trial and, when asked why she then had stated that Platt appeared "'a little weird'" and "'was acting a little nervous,'" Hunter said: "I don't know if I would say nervously; but he was -- he was impatiently -- It seemed that he was impatiently waiting on his friends. I mean the mall was closing. You know, that's what I assumed was happening. . . . He was sitting there and rocking like his leg, patting his foot on the ground." (<u>Id.</u> at 67-68.) Hunter further allowed that, although she may have testified at the state criminal trial that Platt sat on the bench for ten minutes, it could have been longer or shorter. (<u>Id.</u> at 70.)

Plaintiff has cited no authority to support the notion that a retail store should interpret nervous impatience by someone sitting on a store bench for about 10 minutes near the end of a holiday-season shopping day (even if "a little weird") as a sign of impending violence. (<u>See</u> 1:10CV423, Docket Entry 59 at 5-6.) Nor did the undersigned Magistrate Judge find any such case law. Under these circumstances, the Court should conclude that the evidence cited by Plaintiff falls far short of warranting a finding that Defendant Gap should have foreseen that Platt posed a threat.

In sum, the record, taken in the light most favorable to Plaintiff and with the benefit of all reasonable inferences (including for alleged spoliation), does not substantiate his assertion that "Platt's conduct forecasted danger" (1:10CV423, Docket Entry 59 at 5; 1:10CV423, Docket Entry 60 at 5).

## Avoidability through Due Care

Even if (contrary to the preceding discussion, supra, pp. 11-25) the Court found sufficient evidence for a fact-finder to conclude that Plaintiff's shooting by Platt was foreseeable to the GGP Defendants and/or Defendant Gap, the Court still should enter summary judgment against Plaintiff on the duty element of his negligence claims because the record lacks sufficient evidence the shooting was "avoidable through due care," Stein, 360 N.C. at 328, 626 S.E.2d at 267 ("No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care." (emphasis added)). Specifically, in moving for summary judgment, the GGP Defendants correctly observed that the record reflects "Platt approached [Plaintiff] in a crowded mall on one of the busiest shopping days of the year . . . [and, despite the presence in FSTC of] security and police officers . . ., he still shot [Plaintiff]." (1:10CV423, Docket Entry 54 at 11-12.) In other words, the evidence establishes that a "security presence did not deter Platt" (id.). Similarly, Defendant Gap supported its summary judgment motion with citations to an expert's report "that the [s]hooting [i]ncident was not preventable by any reasonable measures by Defendant Gap" (1:10CV423, Docket Entry 58 at 11.)

As a response, Plaintiff's briefs simply assert in conclusory fashion (without any citation to record evidence or pertinent authority):

1) that the GGP Defendants could have prevented Platt from committing violence by having more security officers, by enforcing

more aggressively their policies against loitering, and by taking unspecified measures to ensure that visitors to FSTC did not possess firearms (1:10CV423, Docket Entry 6-7); and

2) that "[t]he entire shooting would have been prevented had [Defendant Gap's] employees approached Platt" (1:10CV423, Docket Entry 59 at 6).

On the record in this case, as this Court (per Judge Frank W. Bullock, Jr.) noted in a prior premises-liability/third-party-violence negligence case, "it would be sheer speculation for the finder of fact to determine either that [the measures suggested by Plaintiff] would have deterred [Platt], or would have been able to prevent him from carrying out his unlawful acts." Reagin v. Terry, 675 F. Supp. 297, 302 (M.D.N.C. 1986), aff'd, 829 F.2d 36 (table), 1987 WL 44656 (4th Cir. Aug. 26, 1987) (unpublished); see also Liller v. Quick Stop Food Mart, Inc., 131 N.C. App. 619, 625, 507 S.E.2d 602, 606 (1998) ("Notwithstanding allegations in plaintiff's complaint that defendant was negligent in failing to take adequate measures, including the provision of security guards . . ., to protect its customers from the criminal acts of third persons, the forecast of evidence failed to show how the foregoing actions, or any other measures, would have prevented plaintiff's assault."). In the absence of competent evidence that reasonable measures available to the GGP Defendants and Defendant Gap would have prevented Platt from engaging in violence, Plaintiff's negligence claims fail as a matter of law on the duty element.

*Proof of a Breach by the GGP Defendants and Defendant Gap*

Should the Court determine that, despite the foregoing discussion, supra, pp. 11-27, a reasonable fact-finder could conclude that the GGP Defendants and Defendant Gap had a duty to protect Plaintiff from Platt, the record nonetheless warrants entry of summary judgment for the GGP Defendants and Defendant Gap because Plaintiff has come forward with insufficient evidence as to the breach element of his negligence claims. In this regard, the GGP Defendants outlined in their summary judgment briefs evidence in the record showing that, at the time of Plaintiff's shooting, they had taken reasonable security measures, including utilizing a professional security company to patrol common areas and employing off-duty police officers. (See 1:10CV423, Docket Entry 54 at 12.) Further, the GGP Defendants pointed out that the undisputed evidence demonstrated that the security presence at the time of Plaintiff's shooting was sufficiently robust that a response occurred within seconds. (See id.)

Defendant Gap similarly supported its summary judgment motion with record citations illustrating the visibility of security patrols near its store around the time of the instant shooting. (1:10CV423, Docket Entry 58 at 11.) In addition, Defendant Gap's summary judgment brief identified expert testimony that "the level of security provided by [the GGP Defendants] was entirely appropriate and reasonable, and the reliance by Defendant Gap on [that] security was entirely appropriate." (Id.) That evidence

reflected that retailers, such as Defendant Gap, rarely maintain their own, independent security forces. (Id.)

Plaintiff's summary judgment briefs, in turn, fail to highlight record evidence that raises a material question of fact as to any breach of duty by the GGP Defendants and Defendant Gap. Instead, as to Defendant Gap, Plaintiff simply has asserted without any evidentiary support or citation of authority that Defendant Gap "breached its duty to Plaintiff by not approaching Platt as he sat on the bench in the store and stalked Plaintiff for 10 minutes" and that Defendant Gap "should have had its own security present to prevent incidents such as this." (1:10CV423, Docket Entry 59 at 6.) The failure by Plaintiff to support these assertions in any way demonstrates that the record cannot sustain his claim. See Reagin, 675 F. Supp. at 302 (ruling that record failed to warrant finding that defendant-business breached duty to protect customers where plaintiff "presented no evidence that additional [security measures] were the custom at other similarly-situated [businesses], or . . . were used at other locations").

Plaintiff has offered a similar conclusory declaration that the GGP Defendants "breached [their] duty to Plaintiff by not providing adequate security officers and by not having adequate security measures in place . . ., [as well as by] not ensur[ing] that the policies it did have in placed [sic] were being enforced by [Defendant Mydatt]." (1:10CV423, Docket Entry 60 at 6.) In discussing this issue, Plaintiff's summary judgment brief fails to cite any record material to show what level of security officers

-29-

the GGP Defendants should have maintained or what additional security measures they should have deployed. (See id. at 6-8.) Further, assuming that a fact question exists as to whether Platt's presence at FSTC for five hours of window-shopping without buying anything constituted loitering in violation of the GGP Defendants' "Code of Conduct" and whether security personnel hired by the GGP Defendants should have noticed this violation (as Plaintiff has suggested (see id. at 6-7)), Plaintiff has not come forward with evidence or authority to connect the enforcement of anti-loitering rules with the prevention of violence (see id.).

Nor has Plaintiff presented any proof that a reasonable intervention designed to address any loitering by Platt would have prevented Platt from committing a violent act. (See id.) To the contrary, Plaintiff proffers only the ipso facto conclusion that "[a]dequate security measures were clearly not in place on December 23, 2006, as a convicted felon was able to roam around [FSTC] for four hours with a loaded gun, sit in a store, stake out his victim, start a confrontation, and shoot Plaintiff in the head leaving him for dead." (Id. at 8.) Avoidance of summary judgment requires more. See, e.g., Emmett, 532 F.3d at 297.

Accordingly, the Court should conclude that, under the record of this case, the GGP Defendants and Defendant Gap are entitled to judgment as a matter of law on the duty element of Plaintiff's negligence claims against them.

*Proof of a Duty Owed and a Breach by Defendant Mydatt*

If (as set forth above, <u>supra</u>, pp. 11-23, 25-27), the GGP Defendants owed no duty to Plaintiff because of the absence of sufficient record evidence that Platt's actions were "foreseeable and avoidable through due care," <u>Stein</u>, 360 N.C. at 328, 626 S.E.2d at 267, the GGP Defendants' agent for carrying out certain security functions, Defendant Mydatt, similarly lacked any duty to Plaintiff. However, even should the Court find sufficient evidence for a reasonable fact-finder to conclude that the GGP Defendants had a duty to protect Plaintiff from Platt, Plaintiff's negligence claim against Defendant Mydatt still fails as a matter of law on the duty element because Defendant Mydatt's contract with the GGP Defendants did not extend to the protection of FSTC patrons from third-party violence. The Court therefore should enter summary judgment for Defendant Mydatt on that ground as well.

"North Carolina tort law recognizes the principle that the extent of a party's duty and its corresponding extent of liability are limited by the scope of the party's undertaking." <u>Dawkins ex rel. Estate of Dawkins v. United States</u>, 226 F. Supp. 2d 750, 759 (M.D.N.C. 2002) (citing, inter alia, <u>Cassell v. Collins</u>, 344 N.C. 160, 163-65, 472 S.E.2d 770, 772-73 (1996), <u>abrogated in part on other grounds</u>, <u>Nelson v. Freeland</u>, 349 N.C. 615, 507 S.E.2d 882 (1998), and <u>Hoisington v. ZT-Winston-Salem Assocs.</u>, 133 N.C. App.

485, 489, 516 S.E.2d 176, 179-80 (1999)).[12]  Accordingly, "the extent of [a security company's] duty to [a] plaintiff [who enters a business served by that security company], if any, is governed by the contract between [the security company] and [the business]." Cassell, 344 N.C. at 163, 472 S.E.2d at 772; accord Hoisington, 133 N.C. App. at 489, 516 S.E.2d at 179-80.  "Thus, in determining whether . . . [to] grant[] summary judgment for [Defendant Mydatt], [the Court must] turn to the contract and any other evidence in the record that might tend to present a genuine issue with respect to the duties owed [P]laintiff by [Defendant Mydatt] under the contract [between Defendant Mydatt and the GGP Defendants]." Cassell, 344 N.C. at 163-64, 472 S.E.2d at 772; accord Hoisington, 133 N.C. App. at 489, 516 S.E.2d at 179-80.

Defendant Mydatt appended to its summary judgment brief a copy of its contract with the GGP Defendants.  (1:10CV423, Docket Entry 56-6.)  In addition, in its summary judgment brief, Defendant Mydatt reviewed in detail the terms of said contract and other record evidence to show that Defendant Mydatt owed no duty to prevent third-party violence against Plaintiff, that Defendant

_____

[12] In Nelson, the North Carolina Supreme Court replaced the traditional distinction between invitees (e.g., business customers) and licensees (e.g., social guests) in favor of a general standard of reasonable care for all lawful visitors.  See Nelson, 349 N.C. at 631, 507 S.E.2d at 892.  The portion of Cassell that addresses the manner in which contracts affect the scope of a defendant's duty, however, does not turn upon the distinction between invitee and licensee, see Cassell, 344 N.C. at 163, 472 S.E.2d at 772 ("Common law distinctions between licensees and invitees, however, are not determinative in the present case."), and thus Cassell remains proper authority on point, as this Court (per Judge Bullock) treated it in Dawkins and as the North Carolina Court of Appeals treated it in Hoisington (both of which decisions came after Nelson).

Mydatt's obligations under the contract to remain unarmed and to maintain high visibility by patrolling in common areas, as well as the absence of any obligation under the contract to perform functions within individual stores, ran contrary to any imposition of a duty on Defendant Mydatt to prevent Platt's armed attack on Plaintiff in Defendant Gap's store, and that Defendant Mydatt performed the duties assigned to it under its contract with the GGP Defendants. (See 1:10CV423, Docket Entry 56 at 6-13.)

In response, Plaintiff did not contest that, under North Carolina law, Defendant Mydatt's contract with the GGP Defendants determines the scope of any duty Defendant Mydatt owed to Plaintiff. (See 1:10CV423, Docket Entry 61 at 3-4.) Nor did Plaintiff contest Defendant Mydatt's contention that said contract lacks any provision that obligated Defendant Mydatt to protect Plaintiff from Platt. (See id. at 4.) Instead, Plaintiff's summary judgment response asserts in conclusory fashion that:

1) because Defendant Mydatt's contractual duties included enforcing FSTC's "Code of Conduct," which prohibited loitering and firearm possession, Defendant Mydatt "had a duty to recognize Platt's conduct [as loitering and firearm possession] and remove him from the premises" (id.); and

2) "[b]y not enforcing the Code of Conduct, in which Platt was in violation, [Defendant Mydatt] breached its duty" (id. at 5).

Such speculative assertions do not suffice to defeat summary judgment. See, e.g., Francis, 452 F.3d at 308; Reagin, 675 F.

Supp. at 302. Under these circumstances, the record establishes Defendant Mydatt's entitlement to judgment as a matter of law.

CONCLUSION

Even if the Court affords Plaintiff the benefit of the maximum adverse inference reasonably warranted by the alleged spoliation in this case, insufficient evidence of the duty and breach elements of Plaintiff's negligence claims exists for a reasonable fact-finder to hold Defendants liable for Plaintiff's shooting.[13]

**IT IS THEREFORE ORDERED** that the Clerk shall make publicly available Plaintiff's summary judgment responses that are currently only available to the Court due to filing deficiencies (1:10CV423, Docket Entries 59, 60, 61; 1:10CV425, Docket Entry 45).

**IT IS RECOMMENDED** that Defendants' summary judgment motions (1:10CV423, Docket Entries 53, 55, 57; 1:10CV425, Docket Entries 39, 41) be **GRANTED**, that Plaintiff's Motion for Redress due to Spoliation [sic] (1:10CV425, Docket Entry 24) be **DENIED AS MOOT**, and that judgment in these two consolidated cases be entered in Defendants' favor.

                                                     /s/ L. Patrick Auld
                                                          **L. Patrick Auld**
                                       **United States Magistrate Judge**

December 5, 2011

---

[13] In light of this determination, the Court need not address Defendant Gap's alternative argument that the record establishes Plaintiff's contributory negligence as a matter of law (see 1:10CV423, Docket Entry 58 at 13-16).